**E-FILED**
Monday, 14 August, 2006 02:37:34 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Russell Francois, d/b/a Francois Associates Architects, | ) ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Case No. 03-1419 |
| | ) | |
| Jack Ruch Quality Homes, Inc.; Schnack Chiropractic Center, S.C.; Custom Design Services, Inc.; and Jack Ruch, | ) ) ) ) | |
| Defendants | ) | |

**ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the court are: Schnack Chiropractic Center's[1] motion to strike (#105), motion for summary judgment (#97) and motion to dismiss (#98). The motions are fully briefed, and I have carefully considered the pleadings and supporting documentation. For the following reasons the motion to strike is denied, and the motion to dismiss and the motion for summary judgment are granted in part and denied in part.

**MOTION TO STRIKE**

In this motion, Schnack Chiropractic asks the court to strike paragraphs 39, 40 and 41 of Francois' affidavit. The three paragraphs are as follows:

- In paragraph 39, Francois states that he delivered a copy of the AIA contract to Schnack as part of the Project Manual.

- In Paragraph 40, he refers to copies of pertinent pages contained in that manual.

---

[1]The other defendants have not filed dispositive motions.

- In paragraph 41, Francois alleges that the agreement between himself and Schnack contains a contingency regarding ownership of the documents should the relationship terminate before completion of the project.

According to defendant, Francois' own deposition testimony contradicts these allegations. In his deposition, Francois testified that he regretted not using the AIA form contract for the Schnack project, and that there was no "specific agreement" between himself and Schnack with respect to ownership of documents if the agreement terminated. He also affirmatively testified that he had never had a conversation about what would happen to the documents should Schnack terminate the relationship.

Francois responds that he was talking about two separate things: in his deposition, he was talking about a signed AIA contract, while in his affidavit he is referencing the unsigned forms contained in the Project Manual, forms that were supposed to form the basis of a contract between Francois and the successful bidder.

I find that Francois' testimony does not contradict the affidavit, for the reason explained by Francois. The motion to strike (#105) is therefore denied.

## SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000); Cox v. Acme Health Serv., 55 F.3d 1304, 1308 (7th Cir. 1995).

2

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994).  The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Vukadinovich v. Bd. of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993);  Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990); DeValk Lincoln-Mercury, Inc. V. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970);  Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).  The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532 (7th Cir.1999). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will

3

facilitate the court's assessment.  <u>Waldridge</u>, 24 F.3d at 922.  Thus, as Fed.R.Civ.Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings. Rather:

> [T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  See also, Local Rule CDIL 7.1(D).

Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence tending.  <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968).  See also <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts).  A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 250.

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted.  <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995), citing <u>Anderson</u>, 477 U.S. at 248.  If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper.  <u>Celotex</u>, 477 U.S. at 322; <u>Waldridge</u>, 24 F.3d at 920.

## UNDISPUTED FACTS

Plaintiff Russell Francois is an architect doing business as Francois Associates Architects.  The business is a sole proprietorship located in Bloomington, Illinois.  The firm provides architectural services for clients, including designing office and commercial buildings.  In addition to Francois, the firm employs another licensed architect, Richard Nice.  There are five phases to architectural services:  schematic design, design development, construction documents, bidding negotiation, and construction observation.  There are also various methods of billing for an entire project and for each phase.

In August of 2000, Francois met with Dr. Monica Schnack and Vicky Pappas to discuss construction of a  building for Schnack's chiropractic practice, Schnack Chiropractic Center, S.C., (hereinafter "Center") in Normal, Illinois.  The Center is wholly owned by Dr. Schnack.  Vicky Pappas is the office manager.  Her duties included payment of invoices and management of accounts receivable.

At the time of this first meeting, the Center was leasing space at Boeykins Place.  The lease was set to expire in February of 2002.  Schnack did not yet own land for a new building.  By the end of that first meeting,  which Francois characterized `as simply an exchange of information, no agreement had been reached.  The parties dispute whether there was a discussion of payment methods at that meeting.

A second meeting was held about a week later.  Francois told them that the building he envisioned was a "simple building."  Schnack and Pappas provided Francois with a picture of a prototypical building and a written statement of specifications (including square footage) desired in the new building. There was no discussion of payment at the second meeting.  A

third meeting, attended by Pappas and Francois, was held at a restaurant.  Schnack did not attend.

Then, in September, Schnack had Pappas telephone Francois to hire him to  prepare the schematic design for that building.  No written contract was executed.  The American Institute of Architects promulgates standard form contracts for architectural contracts. Francois had used these forms before but decided not to in this case because he thought the building would be "relatively simple" and not "particularly expensive."

The terms to which the parties agreed - or at least some of the terms - are included in later invoices sent to Schnack and paid by the Center.  In general the agreement was that Francois' fee would be 7% of the total construction cost;  thus, Francois' fee would increase as the cost of the building increased.  The parties dispute the estimate given for the entire project cost.  There was no written contingency regarding payment if the architect's services were terminated before completion of the project.  At some point during these meetings and discussions, Francois recalls Pappas and Schnack speaking to him about the expiration of the lease for their current office.  The parties dispute whether that conversation extended  to a mandatory completion date.

The schematic design was completed on February 27, 2001;  several revisions were made at Schnack's request in early March.  Then, in March 2001, Francois distributed schematic drawings to Dr. Schnack and to two general contractors in order to solicit a preliminary cost estimate for the proposed building.  One of the contractors was Burkholder. The other was defendant Jack Ruch Quality Homes, Inc. (hereinafter "JRQH"), a corporation doing business in Bloomington.  JRQH is wholly owned by defendant Jack Ruch and his wife Margery Ruch.

6

On April 4, 2001, Francois sent the contractors' estimates to Schnack, explaining that the preliminary estimates were:   JRQH:  $433,425 (plus $181,500 for the land); and Burkholder, $475,147.21(exclusive of land).   The letter to Schnack also said that the estimates were preliminary and that she should include an "additional Project Construction Contingency of approximately 15%."

Beginning on January 30, 2001, Francois began billing Schnack for services rendered. The first invoice, dated January 30, 2001, for $1,429.50, was paid in full on Feb. 1, 2001. The second invoice, dated March 26, 2001 for $3,415.25, was paid on April 20, 2001.

The third invoice dated May 18, 2001 for $1,526.25 was paid on June 1, 2001.  This invoice appeared as follows:

**Project:  New Facilities for Schnack Chiropractic Center, SC**
**Period:  03.17.01 - 05.15.01**

**INVOICE 3**

**Architectural & Engineering Fee**

**Contract Amount**                                                        $499714.00
*Based on an Average of Ruch Preliminary Cost Estimate ($433,425) and Burkholder Preliminary
Cost Estimate ($475,147) plus a Contingency Allowance ($45,4428) : $454,286 + 45,428 =
$499,714).  For invoicing purposes during the planning process, the AE Fees are calculated on
available estimates of construciton [sic] cost.  The final AE Fee will be calculated on the basis of 7% of
the actual Projcet [sic] Construction Cost.

**Architectural/Engineering Fee**                                           34980.00

| Phase | % of Fee | Fee | % Complete | Fee Earned |
|---|---|---|---|---|
| Schematic Design | 18 | 6296.00 | 100 | $6296.00 |
| Design Development | 17 | 5947.00 | 0 | 0.00 |
| Construction Documents | 35 | 12243.00 | 0 | 0.00 |
| Bidding and Negotiation | 5 | 1749.00 | 0 | 0.00 |
| Construction Observation | 25 | 8745.00 | 0 | 0.00 |
| | | | | |
| Total Fee Earned | | | | $6296.00 |

**Total AE Fee Earned** [including current reimbursables ($0.00) and previously invoiced reimbursables ($75.00)]                                      6371.00

**Previous AE Fee** (including reimbursables) Invoiced and Received  4844.75
                Invoice 1 (01.30.01, $1429.50)

7

Invoice 2 (03/26.01, $3415.25)

**Fee This Invoice**                                         1526.25

On June 22, 2001, Schnack purchased the land on which the new office was to be built. Francois claims to have been unable to complete the second and third phases of the project until the land was purchased. Dr. Schnack believes the delay was caused when Francois learned a family member had cancer, although Francois asserts that he and his staff continued to work on the project during this time. At any rate, by September of 2001, Francois states that the second and third phases of the project were complete.

On September 25, 2001, Francois delivered to Schnack a "substantially final" set of construction documents, including 26 drawings and a Project Manual. Each page of the construction drawings had a label reading "Francois Associates Architect" and Francois' Illinois architect's seal. Francois and Schnack discussed and selected a group of six general contractors - including JRQH - from whom they would solicit bids.

The Project Manual contained specifications for the project, an Invitation for Bids, bidding instructions, a supplement to the instructions specific to Schnack's project[2], a bid form, and an AIA document providing the general conditions of an agreement between Schnack and the successful bidder. The Project Manual also provided that delivery of the construction documents to the contractors did not grant them a license to use the documents and that Francois was the author of the documents and would "retain all common law, statutory and other reserved rights in addition to copyright."

---

[2]The supplemental bidding instructions "encouraged" bidders to propose alternatives and/or substitutions for the designs, specs and systems specified in the documents.

8

On September 27, 2001, Francois sent Schnack a transmittal letter that contained the final plans for the building. Francois also set copies of construction documents[3] to the six contractors, including JRQH, in order to generate bids. As of September 27, 2001, JRQH had four copies of the final construction documents and initial schematic design drawings.

Francois' fourth invoice was issued on October 13, 2001 for $21, 252.88. The invoice reflected that the first 3 phases of the architectural work were complete and that Francois was half finished with the fourth phase. This invoice was never paid.

The original bid deadline was October 16, 2001. On October 9, Pappas called Francois to let him know that Schnack was considering pushing the bid deadline back so that one of her patients, who was a contractor, could bid on the project. On October 16, Schnack called Francois and told him she wanted the deadline pushed back to October 23. Francois contacted the six contractors to let them know the deadline was extended and that they had the right to withdraw or modify their bids through October 23.

Later in the day on October 16, Francois received a fax transmission from Schnack. It included a letter from Jack Ruch stating that JRQH would not be bidding on the project because "he would not feel honest about taking [Dr. Schnack's] hard earned money; that he could build an "excellent building at a reasonable price" but that Francois' plans and specs were "taking advantage of [Schnack] and that he and his subcontractors "could not believe" the added costs for the HVAC and electrical system in the specs. The letter then stated that Ruch could easily complete the project in a timely fashion except that he understood there would be delays in the permit process.

---

[3]These documents included the building designs, plans and specifications.

9

The following day, Francois sent a fax to the engineer who had been involved in the process, Geln Bellows.  He attached a copy of Ruch's letter and asked Bellows to contact Schnack to discuss the concerns about the mechanical, engineering and plumbing ("MEP") aspects of the design.  Bellows had previously met with Schnack to discuss the MEP elements in the plan.  On October 19, Bellows met with Schnack and Pappas to review the MEP designs.  He explained that there were many changes that could be made after the bidding that would result in savings on the project.

The bid opening took place on October 23, 2002.  Francois, Nice, Schnack and Pappas were present at the bid opening.  During the bids, Francois and Schnack took notes.  The lowest bid was $566,900, exclusive of any cost for land.  Schnack and Pappas left the meeting, apparently upset about the high bids.  When they left the meeting, Schnack took the final plans with her.  As she was leaving, Francois gave her the notes he had taken during the meeting.

On October 26, 2001, Francois wrote to Schnack and informed her that, based on discussions with the low bidder, he could reduce the cost immediately by over $50,000 and that there were other costs that could be reduced.

 On October 30, Schnack sent a fax to Francois, terminating Francois' services.  Within a few weeks, Ruch met with Schnack who told him she had purchased the construction documents from Francois.  Schnack told Ruch to use the documents to re-design and build the new office.  Using those drawings (with Francois' identifying information removed), Ruch created a re-design.

On December 7, 2001, Ruch presented to Schnack a document entitled "Building Specifications" pursuant to which JRQH would construct a new building for $466,000.  On

10

December 11, 2001, Ruch sent the re-design to David Bunfill of Custom Design[4] asking that he reproduce the non-MEP drawings with a Custom Design label.  The design was reproduced and returned to Ruch.

 On December 26, 2002, Schnack entered into an Agreement for Construction of Commercial Building with JRQH to construct the new office.  Amended Building Specifications were attached.  The total cost had increased to $468,000 due to more expensive options selected by Schnack.  Using those Specifications JRQH prepared to begin construction.  Among other things, he submitted the plans to the Town of Normal in order to obtain permits.

On December 4, 2001, Attorney Kevin Jacobs drafted a letter to Francois stating that Schnack would not pay the fourth invoice.  The draft also stated that Schnack would allow Francois to keep the $6,371 already paid on the first three invoices.   There is a dispute about whether the letter was actually sent on or around that date.  Francois claims not to have received the letter until late March 2002, when it was attached to a second letter from Jacobs (discussed below).

The building process began in early March 2002.  As of March 28, 2002, the concrete had been poured.  By late March, Francois knew that Schnack was building a building on the property at Jacobssen Drive.

On March 25, 2002, Francois sent a letter to Schnack with two enclosures:  a copy of the unpaid fourth invoice and a fifth invoice reflecting completion of the Bidding and Negotiation Phase as well as some additional out-of-pocket expenses.  On March 28, 2002,

---

[4]Custom Design was originally a defendant in this case.  That claim has been settled with the plaintiff and Custom Design is no longer a party to this case.

Francois received a second letter from attorney Kevin Jacobs, expressing surprise that the invoices were sent, in light of his earlier letter, which was attached. That second letter from Jacobs stated that Schnack would attempt to "salvage and use" the plans Francois had prepared.

On September 30, 2002, Francois sued Schnack in McLean County Circuit Court for contract damages of $34,980 less the amount[5] he had received as payment for the first three invoices. It was while that suit was pending that he claims to have first noticed the similar "footprint" of the completed Schnack building. He obtained the plans from the Town of Normal. Based on his belief that those plans were in fact his plans, he voluntarily dismissed the state court contract action and filed this suit on December 30, 2003. Also in December of 2003, Francois was issued certificates of registration by the Register of Copyrights for the architectural drawings he had prepared for Schnack.

The complaint in this case consists of four counts: Count I for copyright infringement under the federal Copyright Act, 17 U.S.C. § 101 et seq; Count II for breach of contract under Illinois common law; Count III for violation of the federal Lanham Act, 15 U.S.C. § 1226 (a); and Count IV for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505. Schnack has moved for summary judgment and dismissal of all four counts.

## JURISDICTION

Federal courts have original and exclusive jurisdiction over copyright actions. 28 U.S.C. § 1338(a). Related questions of contract law and license - both the existence and the

---

[5]At the time that suit was filed, Francois believed the amount paid was roughly $13,000. He now believes it was only about $6,000.

scope - may also be determined in conjunction with resolving copyright issues, by applying relevant state law. I.A.E. Inc. v. Shaver, 74 F.3d 768, 774 n.4 (7th Cir. 1996).

### COUNT I - COPYRIGHT INFRINGEMENT

The Copyright Act protects the holders of copyrights from infringement. A copyright consists of "the bundle of exclusive rights to reproduce, prepare derivative works, to distribute, to perform and to display" the copyrighted work. ITOFCA, Inc. v. MegaTrans Logistics, Inc., 322 F.3d 928, 935 (7th cir. 2003). To establish copyright infringement[6], plaintiff must prove: (1) ownership of a valid copyright; and (2) copying of constituent elements of the copyrighted work that are original. Feist Publications, Inc. v. Rural Telephone Svc. Co., 499 U.S. 340, 361 (1991); Susan Wakeen Doll Co. v. Ashton Drake Galleries, 272 F.3d 441, 450 (7th Cir. 2001). Defendant does not challenge either of these elements in its motion.

The owner of a copyright may transfer, sell or assign any one or all of the "bundle" of exclusive rights conferred by the copyright. With one exception (which is crucial here), the Copyright Act invalidates any such transfer, sale or assignment of copyright ownership that is not in writing signed by the copyright owner. 17 U.S.C. § 204(a). "Transfer of copyright ownership" is defined in 17 U.S.C. § 101; the definition expressly excludes "nonexclusive licenses" from the "writing" requirement. See, I.A.E. Inc. v. Shaver, 74 F.3d 768, 774-75 (7th Cir. 1996). Accord, Lulirama Ltd, Inc. v. Axcess Broadcast Svcs. Inc., 128 F.3d 872 (5th Cir.

---

[6]A copyright owner seeking to assert his copyright under federal law must register the copyright before commencing suit, and he can recover only actual damages (as opposed to statutory damages) for pre-registration infringing acts. 17 U.S.C. § 411(a) and 412(l). Whether there was registration and/or notice at the time of the copying and use is irrelevant to the lawfulness of the copying and use. See, 17 U.S.C. § § 410(c) and 405(b).

1997); Jacob Maxwell Inc. v. Veeck, 110 F.3d 749 (11th Cir. 1997);  MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769 (3d Cir. 1991).

A nonexclusive license does not transfer ownership of the copyright.  Rather, a non-exclusive license "permits the use of a copyrighted work in a particular manner," without any promise that the licensee will not also allow another to use the same work.  Shaver, 74 F.3d at 775.  The existence of a nonexclusive license constitutes an affirmative defense to a claim of copyright infringement.  Id..  The burden of proof as to such a license is therefore on the defendant.  Id.

A non-exclusive license may be granted orally or it may be implied from conduct, including lack of objection.  Shaver, 74 F.3d at 775.  See also, MacLean Associates, 952 F.2d at 778;  Glovaroma, Inc. v. Maljack Productions, Inc., 71 F.Supp. 2d 846 (N.D.Ill. 1999). A nonexclusive license is implied when (1) the licensee (here, Schnack) has requested creation of a work; (2) the licensor (here, Francois) had made that particular work and delivered it to the licensee; and (3) the licensor intended that the licensee copy and distribute his work.  Shaver, 74 F.3d at 776.  The first two elements are not disputed in the case before this court.  It is the third element, that of Francois' intent, that is disputed.

The proper approach to evaluating the element of intent is demonstrated in Shaver, supra, a case with many similarities to the instant case.  In Shaver, Joint Venture entered into a contract with the Gary Regional Airport Authority for  design and construction of an air cargo/hangar building.   Architectural services were subcontracted to architect Paul D. Shaver.  In a letter agreement, Shaver agreed to prepare the schematic design drawings for a fee of $10,000.  Shaver believed that once the schematic design had been approved, he would execute additional written contracts for the remaining phases of the architectural work.

14

When the schematic design drawings were complete, he submitted them to the Airport and Joint Venture with a notice of copyright.  The Airport approved one of his drawings, and Shaver was paid $5,000.

Joint Venture then retained another firm to perform the remaining architectural work, using Shaver's drawing.  When Shaver realized that his involvement in the project was over, he did two things.  First, he sent  his schematic drawings to the Airport's Director along with a letter in which he acknowledged that his participation was over and conveyed his hope that his "ideas and knowledge ... will assist the Airport" in completing the project.  Second, he sought collection of the remaining $5,000 of his fee.  He also sought a $7,000 payment for "assignment" of his copyright on the schematic design drawings.  When an agreement could not be reached about the amount owed to Shaver, Joint Venture filed a declaratory judgment action, seeking a declaration that no copyrights had been infringed and that it had the right to use Shaver's drawings.  Counterclaims were also filed by Shaver.

The District Court found as a matter of law that Shaver had granted the Airport a nonexclusive license to use his schematic design drawings as the basis for completing the project.  On appeal, the Seventh Circuit examined Shaver's articulated "expectation" that he would be the architect taking the project to completion, by determining whether the record would support a determination that this expectation had any "objective foundation."  74 F.3d at 776.  In other words, the Court of Appeals determined whether Shaver's contemporaneous conduct supported his contention that his intent was not to grant a nonexclusive license.

Relying extensively on Effects Assocs. v. Cohen, 908 F.2d 555 (9th Cir. 1990), the Seventh Circuit assessed several objective factors:  the language of the copyright registration certificate, the letter agreement, and deposition testimony; and the parties' conduct.  74 F.3d

15

at 776.  The Court first noted that the language of the letter agreement included nothing to support Shaver's subjective expectation that he would be the architect for the entire project.  The letter defined the scope of Shaver's participation as being limited to the schematic drawings.

The Court of Appeals also noted that Shaver's deposition testimony belied his contention that the drawings were not to be used in the project unless he was involved as the architect.  Id.  In addition, the letter Shaver sent after the new firm had been hired clearly demonstrated his understanding that the drawings would be used in the project, as did his delivery of the drawings to the Airport without any warning that their use would infringe his copyright.  Id.

Applying state law[7] to the effect that contractual terms can only be implied from outward (i.e. objective) manifestations of intent, the Court completely minimized Shaver's subjective intent as being inconsistent with the objective facts.  The Court of Appeals thus affirmed the finding that Shaver had granted an implied nonexclusive license.

In the case before this Court,  those objective factors cannot be analyzed as neatly as was possible in Shaver, in large part because there is no written agreement.  Francois' explanation for not using his profession's form contracts casts some doubt on his assertion that there was an agreement to pay him a percentage of a half million dollar project.

---

[7]The Shaver Court was applying Indiana law.  Illinois law is the same: contracts are to be "interpreted in accordance with the manifest intention of the parties" rather than the subjective intent of one party.  Foxfield Realty , Inc. v. Kubala, 678 N.E.2d 1060, 1062 (Ill.App.1997).  See, Cohen Dev. Co. v. JMJ Properties, Inc., 317 F.3d 729, 735 (7th Cir. 2003)(intent to enter contract determined by objective evidence of intent); Empro Mfg. Co. v. Ball-Co Mfg, Inc.,870 F.2d 423, 425 (7th Cir. 1989)("intent in contract law is objective rather than subjective").

There is, however, language on the third invoice that does suggest just such an agreement.  And that invoice  was paid without any question by Schnack.  Francois argues that  the fact the invoice was paid without question indicates Schnack's acceptance of the terms of the agreement as articulated on the invoice.  While it is true that this invoice includes language about calculation of Francois' fee through completion of the project, there is no amount on that invoice being billed for any stage of the design process beyond the first stage.  The fact that the invoice was paid through the schematic design stage says little, in and of itself, about an agreement extending beyond the scope of the work which Francois had completed at that time.

When that invoice is considered in conjunction with Schnack's and Pappas' conduct between the time that the invoice was issued in April and the time Schnack sent Francois a letter terminating the relationship at the end of October, the language of the invoice seems to take on more importance.  For example, when Schnack received that invoice, she did not tell Francois to stop his work on the plans.  Instead she and Pappas continued to work with Francois all the way through the process of identifying contractors, soliciting bids, and attending the bid opening.

And Schnack does not dispute (at least not in this motion) that there was an agreement with Francois that extended to completion of the building;  she instead argues that Francois' delays in completing the plans and his underestimation of the costs of the project were the reasons she terminated Francois' participation in the project.  (see e.g., Defendant's Statement of Undisputed Fact ¶ 54, 63).   Such  statements could cast doubt on the defendant's position that Francois gave her a license to use his plans with or without his involvement.

17

Similarly the parties do not agree on who said what when about the contractual relationship, the fees to be paid, the dates for completion, and other crucial information that cannot properly be decided on a motion for summary judgment.  Unlike the plaintiff in <u>Shaver</u>, Francois did not simply step aside.  Francois continued to pursue first the contract and then the litigation.  His conduct is not necessarily inconsistent with protection of a copyright, as was the architect's conduct in <u>Shaver</u>.

Also unlike Shaver, however, Francois' copyright registration certificate does not lend support to his position.  It was not in existence contemporaneously with the allegedly infringing conduct.  In fact, it was prepared while litigation was pending, so its language offers little insight into Francois' intent at the relevant time.

There is evidence to support the contentions of both sides, and the weight to be accorded that evidence is in large measure dependent upon credibility.  In other words, this Court cannot say, at this stage of the proceedings, whether Francois did or did not grant an implied nonexclusive license to Schack.  To that extent, the motion for summary judgment is denied.

Defendant next asserts that, even if there was no license, plaintiff is estopped from asserting a copyright infringement claim.  Estoppel is an affirmative defense, so the burden is and will remain on defendant.

To establish estoppel as an affirmative defense to copyright infringement, a defendant must show four elements:  (1) plaintiff knew the facts of the infringing conduct; (2) plaintiff must intend either intend that his conduct is to be acted on or must act in a manner such that the defendant has a right to believe that plaintiff so intends; (3) defendant must be ignorant of the true facts; and (4) defendant must rely  on plaintiff's conduct to its detriment.  <u>Carson</u>

18

v. Dynegy, Inc., 344 F.3d 446 (5th Cir. 2003)(citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 133.07 (2002).  See also, National Business Lists, Incl v. Dun & Bradstreet, Inc., 552 F. Supp. 89, 97 (N.D.Ill. 1982).  Estoppel may be accomplished by plaintiff's silence and inaction.  Id..

According to defendant, Francois was aware at least by March 2003 that Ruch intended to "salvage and use" his plans, and he knew a year earlier that the building was underway.  Francois asserts that the affirmative defense fails on all four elements.  I find that defendant has not met its burden at the summary judgment stage.

First, there is evidence suggesting that Francois may not have known that the Ruch construction was based on Francois' plans until he conducted discovery in his state court breach of contract case, well after much of the infringing conduct had occurred.  Second, the evidence is ambiguous as to what Francois intended.  As discussed above, there is evidence on both sides of the questions as to whether Francois intended that Schnack use the plans.  Third,  Francois' label was on all of the relevant documents given to Schnack, which is some evidence that appears to contradict Schnack's claim of lack of knowledge that Francois claimed ownership.  Fourth, evidence of Schnack's reliance is disputed.  The parties disagree about when Francois received the first letter from the attorney, and even if that letter was actually received in December, it was at about that same time that Schnack told Ruch she had "purchased" the plans from Francois and began working with Ruch to revise those plans.

Defendant also asserts that Francois is unable to come forward with any evidence of damages.  There are two aspects to this argument.  The Copyright Act provides that "no award of statutory damages or of attorney's fees ... shall be made for any infringement or copyright in an unpublished work commenced before the effective date of its registration."

17 U.S.C. §412 (2006)[emphasis added].  The copyright registration in this case is dated

December 2, 2003; there can be no award of statutory damages or attorney's fees arising out

of infringement that predate that registration.  All of the infringing acts predate the registration.

So to the extent that the motion is based on statutory damages and attorney's fees, it is

granted.

That, however, does not entitle Schnack to summary judgment on this claim.  The

Copyright Act provides that a victim of infringement may recover actual damages suffered as

a result of the infringement[8].  § 514(a)(1) and (2).  See, <u>McRoberts Software Inc. v. Media</u>

<u>100, Inc.</u>, 329 F.3d 557, 566 (7th Cir. 2003).  Based on the arguments presented, I am not

willing to say that there are no actual damages that might be proven.  For example, Francois

may be able to prove that his copyright has lost value or that his business or his reputation

has suffered.  There may be other actual damages[9] that can be proved.

---

[8]The Act also allows for recovery of any profits made by the infringer that are attributable to the infringement.  Schnack asserts that she derived no profits from the use of the plans.  This argument, based on the assertion by Pappas that the chiropractic practice has declined or been downsized since the move to the new building, is not disputed by Francois.  The question of Schnack's profits is therefore no longer an issue in this case.

[9]Francois also notes correctly that he need not prove financial loss in order to obtain injunctive relief;  all he need prove is the fact of infringement.  <u>In re Aimster Copyright Litigation</u>, 334 F.3d 643, 649 (7th Cir. 2003).  Because  summary judgment with respect to Francois' claim of infringement has already been denied, it would seem incorrect to conclude that injunctive relief could not be awarded as a matter of law.  Nonetheless, injunctive relief seems largely irrelevant here.  Neither the complaint nor plaintiff's response to defendant's motion articulates what injunctive relief could properly be awarded in this case, where the building is already complete and any infringement is in the past.  Injunctive relief seems unlikely to contribute anything toward making the plaintiff whole.  There has been no argument by defendant on this specific point;  in the absence of full argument I am not ruling out the legal possibility of injunctive relief, just commenting on its unlikely applicability to these facts.

The motion for summary judgment is denied to the extent it is based on the argument that Schnack can prove no recoverable damages.

## COUNT II - BREACH OF CONTRACT

According to defendant, the oral agreement between the parties is unenforceable because there was no meeting of the minds as to the manner in which Francois would be paid if the relationship between Schnack and Francois terminated before the project had been completed.  The agreement only extended to payment if the structure was completed.

As pointed out by plaintiff, however, that is not a basis for entry of judgment in favor of defendant.  There does not appear to be any dispute that there was an agreement pursuant to which Francois would serve as architect through completion of the new building and that his fee for that agreement would be 7% of the total actual construction cost.  Defendant's argument is actually that the contract is unenforceable because it contains no provision for what happens if one of the parties breaches the agreement.  To state the argument that way reveals the inherent flaw:  a contract need not foresee a breach in order to be enforceable.  See, e.g., Midwest Environmental Consulting & Remediation Svcs., Inc. v. Peoples' Bank of Bloomington, 620 N.E.2d 469, 477 (Ill.App.1993).

To prove breach of contract, a plaintiff must show the existence of an agreement, performance by plaintiff, non-performance by defendant, and damages.  See, e.g., Berry v. Oak Park Hosp., 628 N.E.2d 1159 (Ill.App.1993);  Gonzales v. American Express Credit Corp., 733 N.E.2d 345 (Ill.App. 2000).  Plaintiff has put forth evidence in support of all these necessary elements.  The motion for summary judgment as to the breach of contract claim is therefore denied.

21

According to Defendant, Plaintiff's breach of contract also fails because it is based on disappointed contract expectations, the allegations of which are disproved by the payments Plaintiff received for his services.  This argument consists of two sentences,  unexplained and unsupported by citation to legal authority.  The court need not consider such incompletely developed arguments and does not do so here.

## COUNT III - LANHAM ACT

The Lanham Act provides in pertinent part:

> Any person who, on or in connection with any goods or services ... uses ... word, term, name, symbol, or device ... or any false designation of origin ... which is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a)(1)(A).

Plaintiff's claim for violation of the Lanham Act is based on allegations that someone other than Schnack (Ruch or someone at Ruch's direction, at the direction of Schnack)  first copied Francois' plans and then revised them and used them without attributing the plans to the original creator, namely Francois.  Defendant first argues that it was Francois who provided the drawings to Ruch, so that any misuse by Ruch cannot be attributed to Schnack. But because Plaintiff has also alleged that Schnack mis-represented to Ruch her ownership of the documents, I find that it is a question of fact whether Ruch's actions are attributable to Schnack.

Defendant next argues that the Lanham Act has been preempted by copyright law in those circumstances, pursuant to Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003).  In that case, the Supreme Court discussed what is meant by "false designation

of origin" under the section of the Lanham Act quoted above.  Dastar copied defendant's creative work (a film), made minor revisions, and then marketed the revised product as its own.

For a "communicative product" such as a book or video, the Dastar Court considered the possibility that "origin" included not merely the physical producer of the item (e.g. the publisher) but also the creator of the content being conveyed (e.g. the author).  Id. at 33.  Such a definition would, however, create a problem because it would cause the Lanham Act to conflict with copyright law, the primary source of protection for communicative works.  Id.  As a result, the Court concluded that the copying defendant was in fact the "origin" of the materials in issue;  the defendant's claim to be the origin of the material was not, therefore a violation of the Lanham Act that could be pursued by the creator of the substance of the material.  Id. at 37-38.

Francois attempts to distinguish Dastar by asserting that his claim is NOT that Ruch falsely designated the origin of the plan but rather that Ruch "used so many designs and drawings that so closely matched those of Francois, a situation to which Dapstar [sic] simply does not apply."  Plaintiff has not cited any authority for this interpretation of Dastar, and I fail to see  a distinction.  Dastar made it clear that there is no claim under the Lanham Act for copying, revising, and using a copyright-able work.  Such claims exist if at all under copyright law.

Plaintiff also attempts to rely on Johnson v. Jones, 149 F.3d 494 (6th Cir. 1998).  In that case, the Circuit Court considered the applicability of the Lanham Act to an architect's plan under circumstances remarkably similar to those before this Court:  one architect took another's plan, removed the identifiers and replaced them with his own, and then used the

plans as though they were his own.  But the <u>Johnson</u> case preceded  <u>Dastar</u>, and the Plaintiff has failed to provide any reasoned explanation as to how Johnson could survive after Dastar, at least under the circumstances present in this case. Francois' claim  is directly tied to the content of his architectural work;  the distinction made by <u>Johnson</u> - namely that architectural plans are more akin to "product" than "copyright-able communication" - is no longer a valid distinction.

The <u>Dastar</u> definition and subsequent holding surely applies to the architectural plans at issue in the case before this Court.  I have already held that Plaintiff's copyright claims survive summary judgment.  The same is not true of the Lanham Act claim.  With respect to that claim, the Defendant's motion for summary judgment is granted.

### COUNT IV -  CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

Plaintiff does not contest dismissal of Count IV; that Count is therefore dismissed with prejudice.

### CONCLUSION

For the reasons stated herein, the motion to dismiss (#98) and the motion for summary judgment (#97) are granted in part and denied in part, as follows:  granted in part and denied in part as to Count I;  denied as to Count II, and granted as to Count III and Count IV.  The motion to strike (#105) is denied.

This case remains set for final pretrial on September 15, 2006, and jury trial on October 2, 2006.

ENTER this 14th day of August, 2006.

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE